UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          Case No:        3:23-cr-166-HLA-JBT

AMIT PATEL

_____/

**SENTENCING MEMORANDUM AND**
**INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Defendant, Amit Patel, by and through his undersigned counsel, and hereby files this Sentencing Memorandum and Incorporated Memorandum of Law, and in support thereof, states as follows:

A.      Introduction

According to the provisions of 18 U.S.C. §3553, the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with statutory purposes of sentencing, and in determining such sentence, the court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and (2) the need for the sentence imposed as set forth in §3553(a)(2).

In consideration of the sentence that must be imposed in this case, Amit Patel respectfully requests that the Court consider the following information in mitigation of his sentence.

B.      Mr. Patel's Current Posture

On December 14, 2023, Mr. Patel pleaded guilty to counts One and Two of an Information. Those counts charged wire fraud and money laundering, respectively. On the same date, Mr. Patel entered into a written plea agreement with the Government and has acknowledged responsibility for the offenses as charged. He has remained completely cooperative with the government and has

fulfilled the terms of his plea agreement. Prior to his plea agreement, Mr. Patel and counsel met

with case agents and Assistant United States Attorneys and made a full allocution without Rule 11

protections or the benefits of a proffer agreement. Mr. Patel has fully come to terms with his error

in judgment prior to the Government's case against him has come to fruition. Mr. Patel greatly

laments his involvement in this offense, and the associated harm to the victim, as well as the costs

and inconvenience to the Government and the people of the United States. Mr. Patel states:

> Upon reflection of what has happened, I see my detection in this
> offense as an act of providence. So, as I think about it, I'm glad that
> I got caught. Although I have much trust to restore in the
> community, I now see the situation as a way to help as many others
> as I can who have addictions and problems with gambling. I realize
> that because it happened to me, it can happen to anybody.

On the date of the plea, Mr. Patel made his initial appearance and entered a waiver of

Indictment. He was allowed to remain at liberty on a $10,000 unsecured bond with pretrial

supervision. Mr. Patel has complied with all of the terms and conditions of her release. Mr. Patel

was adjudged guilty of Counts One and Two on December 20, 2023. As of the date of sentencing,

Mr. Patel will have completed nearly three months of pretrial supervision without incident.

C.     Collateral Consequences of the Offense

In addition to the usual consequences of incurring a felony conviction, such as the loss of

certain civil rights, the privilege of voting, and the collateral consequences, they will be unique

and far-reaching for Mr. Patel.[1] First, due to his own conduct, Mr. Patel has lost a much-coveted

job in an industry known for satisfaction and enjoyment. As a former employee of a National

---

[1] Collateral consequences are legal and regulatory sanctions and restrictions that limit or prohibit people with criminal records from accessing employment, occupational licensing, housing, voting, education, and other opportunities. https://niccc.nationalreentryresourcecenter.org/.

Football League franchise, Mr. Patel was privileged to be one of only about 3,600 people in the country working for the NFL.[2] Given the viral publicity generated by this case, it is unlikely that Mr. Patel will ever have a similar opportunity for such a position in the future.

Second, since the case involved economic offenses, Mr. Patel has been associated with conduct that betrayed financial trust and would thereby be perceived as a third-party risk to the financial services industry. Consequently, Mr. Patel will likely find it impossible to secure employment in this field ever again. This is especially salient for a person with an undergraduate degree in accounting, as well as a Master of Business Administration degree, where he will essentially be unemployable in those fields.  Mr. Patel was working toward a lifelong goal of becoming a certified public accountant in the State of Florida.[3] The collateral consequences of the convictions are especially onerous in this regard because Mr. Patel will be permanently barred from CPA licensure in the future.[4]

Third, Mr. Patel's involvement in the offenses of conviction has created exponential (albeit self-induced) reputational harm given the nature of digital transfer of news and information.  In less than a half-second, a Google search produced at least 22,000 viral results for "Ex-Jaguars Employee Accused of Embezzling $22,000 million."[5]  At age 31, Mr. Patel will endure decades of inordinate and adverse publicity for this incident, and he will be endued with a digital scarlet letter,

---

[2] As of January 2024, the number of full-time employees in the United States was 132,550,000. Therefore, the percentage of NFL employees to the main U.S. workforce was 0.00271.
[3] Mr. Patel reported that he previously took and passed two out of the four sections required for Florida CPA licensure.
[4] An applicant who has committed a felony of the first degree, a capital felony, a felony involving money laundering, a felony of embezzlement, or a felony related to the financial services business is permanently barred from licensure. This bar applies to convictions, guilty pleas, or nolo contendere pleas, regardless of adjudication, by any applicant. Appendix I, Exhibit A.
[5] Google search inquiry. 13 February 2024 (18:30).

3

causing a perpetual continuation of the impact of his conduct with no possibility of sabbatical relief.

According to the provisions of 18 U.S.C. §3553(a) and given the Defendant's mental and emotional condition (addressed *infra*) the Court is implored to consider this information in pursuit of the imposition of a sentence that is sufficient but not greater than necessary. Therefore, to the extent that these circumstances have a secondary punitive effect on Mr. Patel, the foregoing collateral impacts of his conviction may be relevant to the calculus of a variance analysis in the disposition of this case.

D.    <u>Nature and Characteristics of the Offense/Factors in Mitigation of the Offense</u>

There are three principal factors in mitigation of the nature and circumstances of the offense that may be pertinent to the provisions of USSG §1B1.4 (Information to Be Used in Imposing Sentence; Selecting a Point within the Guideline Range or Departing from the Guidelines).[6]  First, although Mr. Patel's criminal history category consists of one point, the prior conviction, and sentence on September 4, 2014, was for possession of a small amount of cannabis, representing conduct occurring more than five years prior to the beginning of relevant conduct in the instant case. The sentence prompted a diversionary (sealed record) sentence while the defendant was a college student when he was much more prone to youthful indiscretions and mistakes.

Mr. Patel has no sentences for felony conduct prior to the conduct in this case. Although a downward departure below the lower limit of the applicable guideline range for Criminal History Category I is prohibited, the anomalous nature of the prior disposition is the only impediment to

---

[6] A court is not precluded from considering any information that the guidelines do not consider in determining a sentence within the guideline range or from considering that information in determining whether and to what extent to depart from the guidelines. USSG §1B1.4, comment. (backg'd.).

Mr. Patel securing the status of a zero-point offender, which would afford him a 2-level decrease in the offense level.[7] Consequently, Mr. Patel's case atypically rises just shy of the level required to benefit from this provision.

Second, as thoroughly outlined and discussed in the presentence report, at all times during the commission of the offense conduct, Mr. Patel was beset with exceptional mental and emotional problems. Those problems, compromising Mr. Patel's volitional controls, were exacerbated by the presence of a gambling disorder. According to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), gambling addiction is regarded as a non-substance-related disorder, which in this case began in late adolescence. Accordingly, the nature and circumstances of the offense were influenced by this factor in a manner that might distinguish the defendant's conduct from the typical iteration of this offense.

Third, as reflected in ¶29 of the PSI, Mr. Patel voluntarily surrendered information regarding similar misconduct with a prior employer that had gone undetected. This information would not have been discovered by the government without Mr. Patel's acknowledgment. According to §5K2.16. Voluntary Disclosure of Offense (Policy Statement), if the defendant voluntarily discloses to authorities the existence of and accepts responsibility for the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted. Although the disclosure of similar prior misconduct is not contemplated by this guideline, Mr. Patel (without prior assurances) voluntarily conceded behavior that potentially could have been considered by the Court as a factor in

---

[7] USSG §4C1.1. Adjustment for Certain Zero-Point Offenders. The 2-level decrease is applied if the defendant meets all of the criteria at (a)(1)-(10). A review of those criteria confirms that Mr. Patel meets all requirements other than the presence of one criminal history point.

aggravation of sentencing based on the history and characteristics of the defendant.   (See §1B1.4, above.)

Although it is requested that the Court would not disadvantage Mr. Patel with such information, his admissions, absent agreement from the Government and protection under the rules of everything even remotely associated with his conduct in the instant offenses of conviction evince an unimpeachable acceptance of responsibility.[8] Consequently, while no downward departure may be warranted under this guideline, such purgative conduct may suggest that a sentence under the advisory guidelines system would produce a sentence that is greater than necessary.

E.    Mr. Patel's History and Characteristics

There are several highlights from Mr. Patel's life narrative consisting of offender characteristics that distinguish Mr. Patel's case from the typical cases covered by the guidelines. Consequently, they are compelling for sentencing. Those circumstances started with the challenges of Mr. Patel's mother and father immigrating from India before his birth. Upon arrival, they were initially domiciled in Chicago, Illinois.   At age five, Mr. Patel's parents departed Chicago for Iowa, where they became the owners of a small hotel.   While living in the hotel as a family, Mr. Patel and his family almost immediately began enduring racial discrimination, animus, and verbal abuse based on their status as Indian immigrants.[9] This treatment began in 1998 when Mr. Patel was six and was constant.   This marked the first in a series of trauma-inducing circumstances for Mr. Patel.

---

[8] *U.S. v. Farrier*, 948 F.2d 1125, 1127 (9th Cir. 1991) (admission of guilt to other crimes can justify departure under §5K2.0, but not further adjustment for acceptance).
[9]  Patel, Nayana. Personal interview.

Within three years of arriving in Iowa, the September 11, 2001, attacks on the United States occurred. Mr. Patel was nine years of age. What came next was an earth-shattering traumatic event in Mr. Patel's prepubescent life. On October 4 – within 23 days after the "9/11" attacks – Mr. Patel's uncle Vasudev Patel, was murdered at his gas/convenience station in Mesquite, Texas by a neo-Nazi/white supremacist assailant, whose motivation was "to retaliate on local Arab Americans, or whatever you want to call them." [10] On July 20, 2011, the murderer was subsequently executed by lethal injection.[11]  Accordingly, Mr. Patel and his family lived with the resulting grief for almost 10 years before justice was served in the case. The murder of Mr. Patel's uncle represented a second episode of extreme trauma occurring before the onset of puberty.

In 2002, for reasons partly attributable to the experiences of racial animus, Mr. Patel and his family ended their stay in Iowa, moving to Jacksonville, Florida, where his father entered into a partnership to purchase a Sonic franchise. Mr. Patel was 11 years old at the time.   In December 2005, when Mr. Patel was 13, he suffered from yet another experience of trauma when his father died of cardiac arrest at age 46.   Following the passing of Mr. Patel's father, a business failure occurred that affected his business partners. These circumstances precipitated a lawsuit by the partners. During the pendency of the lawsuit, Mr. Patel's mother and the family received hate mail and other related gestures blaming her for failed business concerns.[12]  According to Ms. Patel, those times were filled with extraordinary stress, which trickled down to Mr. Patel and his brother's experiences in school and other aspects of their growth and development. The passing of Mr. Patel's father constituted a third instance of trauma; this time in early adolescence.

---

[10] Appendix I, Exhibit B.
[11] Appendix I, Exhibit C.
[12] *Id*. Nayana Patel.

At age 14, while a freshman in high school, Mr. Patel described a troubling circumstance occurring at school when an adult female cafeteria worker began stalking and otherwise exhibiting inappropriate behavior toward him.[13] Mr. Patel stated that he believed that she was obsessed with his appearance. He indicated that she was in her late 30s and was married. Mr. Patel reported that while she was otherwise nice to him, she would lurk in the school's parking lot for him, as well as attempt to connect with him on social media. He stated that eventually the woman located a picture of him and posted it on her Instagram account. Mr. Patel stated that on at least one occasion, the employee attempted to physically embrace him against his will. He recalled that on another occasion, the woman showed up at his home unexpectedly. Despite this breach in his childhood security, Mr. Patel indicated that he never mentioned this situation to his mother. Consequently, Mr. Patel had no psychological intervention for this episode of abusive conduct by an adult.

When Mr. Patel was 14, his mother married his now stepfather, Sunil Koya. Mr. Patel and his stepfather developed a close and respectful relationship. Although not as traumatic as the loss of his father, within two years of his father's death, Mr. Patel's grandfather, Raman Patel, died of a stroke. At age 17, Mr. Patel, now in high school, began drinking beer and using marijuana. By this time, he had incurred three incidences of trauma-inducing events, and notably, received no psychological intervention and treatment.

When Mr. Patel was 17, that year was also a pivotal time in his life for other reasons. First, he began dating a girl who was not of Indian ethnicity. This decision by Mr. Patel was mentally and emotionally crippling because his mother had a strong cultural bias toward her son dating only girls of Indian descent. (To appease his mother, Mr. Patel secretly dated his Caucasian high school

---

[13] *Id*. Amit Patel.

sweetheart from ages 17 through 23.) Mr. Patel was distressed that he had to hide this relationship from his mother, whom he respected and adored. In an ironic twist of fate, his girlfriend "cheated" on him and subsequently "dumped" him for another man. [14] According to Mr. Patel, she subsequently married the other person.

While Mr. Patel was still in high school, he began acting on his latent impulse for online gambling. Former high school classmates have confirmed that Mr. Patel was known to have an issue with gambling during his high school years. His mother's disapproval of his dating choice, and the need to hide his decision from her, marked the beginning of a fourth trauma-related circumstance. While attempting to manage these divergent circumstances, in the spring of 2010, Mr. Patel graduated from Paxon School for Advanced Studies. In the fall of that year, still at age 17, Mr. Patel embarked on his first year in college at Florida State University.   During that year, Mr. Patel's addictive profile was augmented by his now heavy use of alcohol and marijuana. Mr. Patel also began using Adderall, first as an aid for alertness for studying, although his use of the substance quickly became recreational and problematic.

While in Tallahassee, a common denominator to Mr. Patel's gambling disorder emerged. As a devoted mother, she gave him one of her credit cards, which became an unwitting facilitator to the access of funds Mr. Patel used to engage in online gambling. Mr. Patel had his mother's credit card at the beginning of his gambling disorder; he possessed his employer's AMEX card while working at Deloitte; and he possessed the virtual credit card (VCC), while employed at the Jaguars. The linear connection among these events explains Mr. Patel's evolution to gambling from adolescence through the instant offense.

---

[14]  *Id*. Amit Patel.

Armed with his mother's credit card, at age 18, Mr. Patel began gambling at establishments such as the Jax Poker Room (now Best Bet). He quickly began accruing bills on her card as a result of gambling losses. Mr. Patel's gambling occurred in person as well, on cruise ships, having once won $2,000 for an initial $100 wager.[15] Mr. Patel had access to his mother's credit card throughout his college years and traveled to gamble at destinations such as Hard Rock in Ft. Lauderdale, Florida.

On May 30, 2014, while still in college, Mr. Patel's lifelong childhood friend, Conner McNally was killed in a car crash on the Arlington Expressway. Mr. Patel was extremely close to Mr. McNally and his death came as a tremendous shock. It was during this year that Mr. Patel was arrested while in college on the marijuana charge. Mr. Patel's paternal grandfather also died in 2014. In 2015, Mr. Patel graduated from college. In 2016, his paternal grandmother died of a stroke. The close association in time of the several deaths – particularly that of Conner McNally – was a further blow to Mr. Patel's emotional wellbeing at a time when his gambling disorder had reached its maturity.

The year 2017 was eventful for Mr. Patel as he graduated with his MBA from Florida State University. During that year, he began working at Deloitte, but lost his maternal grandmother, with whom his family had previously resided. As mentioned earlier, while at Deloitte, Mr. Patel had a company AMEX card and used it to incur gambling debts. [16] With his brother's help, however, he paid the bill back before detection when his brother cosigned a debt consolidation loan in the amount of $16,000. [17] Driven by his addiction to gambling, Mr. Patel's situation became

---

[15] *Id*. Amit Patel.

[16] Patel, Devin. 30 January 2024. Personal interview.
[17] Appendix I, Exhibit D.

increasingly pathological when he engaged in behavior such as selling household items for money, buying, and flipping items on eBay, selling his plasma, and obtaining payday loans.[18] While Mr. Patel purchased collectible items with fraud proceeds, the items were not for his personal collection, but in the hopes he could sell them for more money than he purchased them to further fuel his gambling addiction.

A final traumatic circumstance for Mr. Patel occurred when on July 20, 2019, just before the earliest date of relevant conduct (September 19, 2019), his stepfather contracted COVID-19, and during a hospital stay, was diagnosed with Compartment Syndrome, put in a medically induced coma, and subsequently placed on a ventilator for life support.[19] The family was faced with the heart-rending decision of disconnecting his stepfather from the ventilator and was forced to begin contemplating his funeral arrangements. After much struggle, Mr. Patel's stepfather recovered but has lost function in his left arm and hand. Mr. Patel has been instrumental in supporting his stepfather through his adjustment to this permanently disabling condition.[20]

Relationship with Michaela Miskin – In contrast to numerous situations inviting trauma into his life, Mr. Patel is in a positive relationship with Michaela Miskin. Ms. Miskin, aged 30, lives in Jacksonville, Florida, and is employed as a Nursing Education Specialist at Mayo Hospital.[21] Ms. Miskin and Mr. Patel met in September 2021 and have been dating for the past two and a half years. Ms. Miskin was eager to describe her experiences with Mr. Patel and her assessment of his character and personality. Ms. Miskin related that although she did not know Mr. Patel as a child, she believes that the death of his father has had a profound impact on his life.

---

[18] *Id*. Amit Patel.
[19] Koya, Sunil. 21 December 2023. Personal interview.
[20] *Id*. Nayana Patel.
[21] Miskin, Michaela. 8 February 2024. Personal interview.

She also perceives that Mr. Patel's family's journey as immigrants to the United States and his strict upbringing caused him to have to make several difficult emotional adjustments during childhood. Ms. Miskin indicated that she believes that poor coping skills and alcohol use disorder were likely at the heart of his offenses of conviction. She stated that he was "so sick over the past year" but has been "working hard on himself in rehab."

Ms. Miskin stated that Mr. Patel is a truly kind person and has a good relationship with everyone. She indicated that he loves football and has an overly sweet disposition. Ms. Miskin emphasized that Mr. Patel is a "good, kind, person." With regard to their dating life, Ms. Miskin reported that Mr. Patel always tells her the truth, never sugar-coating anything about his observations in the relationship. She hastened to add that Mr. Patel "makes [her] a better person by telling her what she doesn't want to hear sometimes." Ms. Miskin concluded her remarks by stating that her family loves Mr. Patel and her friends say, "he is a great guy and a good person."

F.    Mr. Patel's Issues of Therapeutic Concern

As described earlier and in the Presentence report, from an incredibly young age the trajectory of Mr. Patel's life has been disrupted by the influence of underlying emotional circumstances pointing to the development of addictive behavior. These circumstances have converged in a manner that formed a nexus to the offense behavior in this case. Mr. Patel acknowledged to the probation office that he would benefit from mental health treatment specifically including a component for gambling disorder.

On March 23, 2023, at the UF Health Florida Recovery Center, Mr. Patel was diagnosed with the following therapeutic conditions:[22]

•      Severe Alcohol Use Disorder (CMS-HCC: 55)

---

[22] Appendix I, Exhibit E.

- Gambling Disorder, Severe; Mild
- Stimulant Use Disorder (CMS-HCC: 56)
- Cannabis Use Disorder, Moderate (CMS-HCC: 55)

From July 6, 2023, to November 23, 2023, Mr. Patel participated in outpatient therapy at Stephens Therapy, for the diagnosis of Gambling Disorder, moderate, in early remission. [23] According to Paula Perez, MHS, LMHC, LPCC, the goal of therapy was to "further address underlying issue related to his gambling behavior, after completing a residential program." Regarding Mr. Patel's prognosis, Ms. Perez indicated that "Mr. Patel's prognosis for a full recovery is positive with continued recovery support as needed."

If sentenced to a term of imprisonment at the Bureau of Prisons ("BOP"), it should be noted that the BOP has no treatment programs that are designed to treat inmates suffering from gambling disorders. According to a review of the BOP's Directory of National Programs, as well as the BOP's Custody and Care section on its website, there are 17 main treatment programs, such as the Residential Drug Abuse Program (RDAP), which are designed to provide treatment for affected inmates. Mr. Patel will need continued intervention and treatment to bring about a permanent improvement in his condition.

According to 18 U.S.C. §3553(a)(2)(D), one of the statutory factors to be included in the calculus of the need for the sentence imposed is to "provide the defendant with needed … medical care, or other correctional treatment in the most effective manner." Since Mr. Patel began intervention for his gambling disorder almost immediately after the detection of the offense, it is anticipated that the sentence will incorporate mental health treatment whether the sentence involves custody or community supervision. Accordingly, Mr. Patel's continuation in post-offense

---

[23] Appendix I, Exhibit F.

gambling addiction treatment sentence and his willingness to participate in future treatment militates in favor of the imposition by the Court of the least onerous sentence possible.

G.    Mr. Patel's Post-Offense Rehabilitation

In addition to Mr. Patel's early acceptance of responsibility characterized by voluntary disclosure to law enforcement of prior similar misconduct at his previous employer, he has remained on a path of conduct evincing extraordinary efforts at rehabilitation prior to sentencing. First, on March 23, 2023, following his detection and termination from his job at the Jacksonville Jaguars, Mr. Patel began a course of diagnosis and inpatient treatment at the University of Florida Recovery Center. Mr. Patel remained in inpatient treatment for his alcohol abuse and gambling disorder through June 27, 2023.

On July 1, 2023, in progression with his continued treatment for alcohol abuse disorder, Mr. Patel began participating in Gamblers/Alcoholics Anonymous (AA/GA). In fact, Mr. Patel took the initiative to start a GA chapter at Jacksonville Beach. As of February 27, 2024, Mr. Patel has attended at least 60 AA/GA meetings.[24] Also, from July 6, 2023, through November 16, 2023, Mr. Patel participated in psychotherapy with Paula Perez, of Stephens Therapy and Associates. All of Mr. Patel's efforts at post-offense rehabilitation occurred prior to his initial appearance on December 14, 2023.

In addition to Mr. Patel seeking clinical assistance for his therapeutic concerns, he began laying the foundations for helping others with gambling disorders by creating an organization called Round Robin Recovery, LLC. On July 10, 2003, the company was organized in the State of

---

[24] Appendix I, Exhibit G.

Florida.[25] Under this rubric, Mr. Patel aspires to become an advocate for the treatment and education of affected persons. Mr. Patel hopes to develop software to help identify addictive behavior in gamblers in a timely manner. Given Mr. Patel's exceptional efforts at post-offense rehabilitation – all of which occurred even prior to the filing of the criminal Information – his case may be considered out of the heartland of similarly situated offenders convicted of fraud-based cases, militating in favor of a sentence outside of the advisory guidelines system

H.      Mr. Patel's History of Community Service/Prior Good Works

        Although according to §5H1.11, public service or prior good works are not ordinarily relevant in determining whether a departure is warranted, these factors are not prohibited under the advisory guidelines system. More specifically, they may be considered under a §3553 analysis of factors in support of a variance from the advisory guidelines system. Despite his relative youth, Mr. Patel has provided service to others in the following ways:

- •        Participated in Youth Leadership Jacksonville: 2009 – 2010
- •        Volunteered 200 hours at St. Luke's Hospital
- •        Participated in Heart Walks through the American Heart Association
- •        Volunteered at Sulzbacher
- •        Participated in Next Up Jax

        Although Mr. Patel's service to the community and prior good works may not singularly rise to the level of a downward departure, the attributes displayed in Mr. Patel's service to the community demonstrate another positive aspect of his history and characteristics that may be relevant to consideration of a variance from the advisory guidelines system. Consequently, a sentence under the advisory guidelines system may result in a sentence that is greater than necessary to address the statutory purposes of sentencing.

---

[25]  Appendix I, Exhibit H.

I.      <u>Mr. Patel's Support Within the Community</u>

Mr. Patel continues to receive unwavering support and encouragement from his girlfriend, his friends, and other extended family members. All his relatives and friends are respected, law-abiding citizens. As such, they are in a position to assist and encourage Mr. Patel to comply with any and all conditions of the Court, should he receive a sentence that would allow him to remain in the community and any conditions of supervised release.

Additionally, in the aftermath of his conviction in this case, Mr. Patel continues to enjoy tremendous support from wider and varied sectors of the community. Several people in the general community, who are knowledgeable of Mr. Patel's character, have written letters of support on his behalf. They are appended to this report for the Court's further consideration.[26] The collective theme of their sentiments is that Mr. Patel is humble and hardworking, kind, and caring, and honest and upstanding. None of the letter writers indicate that they have seen anything in Mr. Patel's background that presents an ongoing threat to any part of the community.

J.      <u>Factors Militating in Favor of Downward Departure</u>

According to §5H1.3. Mental and Emotional Conditions (Policy Statement) mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. The Defendant has been diagnosed with gambling disorder; a previously undiagnosed condition that has been effectively present since he was a juvenile. According to the DSM-5, he has a mental and emotional condition recognized by the field of clinical psychology.[27]

---

[26] Appendix II, Exhibits 1-8.

[27] The fact that the basis for an adolescent gambling addiction was not discovered during adolescence would constitute

Although according to §5H1.4. Gambling Addiction, etc. (Policy Statement), addiction to gambling is a prohibited reason for a downward departure, the addiction originated prior to full brain development (age 25 in males[28]), exacerbating the underlying mental and emotional conditions that contributed to a significantly impaired ability to control behavior that the defendant knows is wrongful.[29] At the still relatively youthful age of 31 at the time of sentencing, there is a need to provide the defendant with needed … medical care, or other correctional treatment in the most effective manner, as contemplated by 18 U.S.C. §3553(a)(2)(D). This statutory factor mirrors the guideline at §5C1.1. Imposition of a Term of Imprisonment, which encourages downward departures to alternative sentences to accomplish a specific treatment purpose in the case of a significant mental illness.[30]

Since gambling disorder is recognized by the field of clinical psychology, and given its nexus to the instant offense, this condition, in combination, and entwined with the defendant's mental and emotional condition, as well as other aspects of his history and characteristics, strongly militates in favor of a downward depart from the advisory guidelines sentencing range.

---

a form of child neglect, which would be an adverse childhood experience ("ACE"). Consequently, by definition, the defendant would have been under a measure of continual toxic stress unbroken by therapeutic intervention.

[28] Arain M, Haque M, Johal L, Mathur P, Nel W, Rais A, Sandhu R, Sharma S. Maturation of the adolescent brain. Neuropsychiatr Dis Treat. 2013;9:449-61. doi: 10.2147/NDT.S39776. Epub 2013 Apr 3. PMID: 23579318; PMCID: PMC3621648.

[29] But for the prohibition against gambling as a reason for a downward departure, the defendant's situation might otherwise rise to the level of a downward departure based on the defendant's diminished capacity. According to §5K2.13. Diminished Capacity (Policy Statement), a downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.

[30] Departures Based on Specific Treatment Purpose – There may be cases in which a departure from the sentencing options authorized for Zone C of the Sentencing Table (under which at least half the minimum term must be satisfied by imprisonment) to the sentencing options authorized for Zone B of the Sentencing Table (under which all or most of **the minimum term may be satisfied by intermittent confinement, community confinement, or home detention instead of imprisonment) is appropriate to accomplish a specific treatment purpose**. Such a departure should be considered only in cases where the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, **or suffers from a significant mental illness**, and (B) **the defendant's criminality is related to the treatment problem to be addressed.** USSG §5C1.1, comment. (n.6).

Accordingly, a downward departure from the imprisonment range may be warranted to reflect the influence of this factor.

K.    Factors Militating in Favor of a Variance from the Advisory Guidelines

The history and characteristics of Mr. Patel, as evidenced by a reiteration of the facts and circumstances in support of a downward departure reflecting Mr. Patel's history and characteristics, militate in favor of a sentence outside of the advisory guidelines system. The importance of these circumstances is reinforced by Mr. Patel's status as a nonviolent offender. Furthermore, it is anticipated that a sentence in the alternative to imprisonment is sufficient to satisfy all the purposes of 18 U.S.C. §3553(a)(2)(A)(1)-(7).

Although under §5H1.4. Gambling Addiction, etc. (Policy Statement), gambling addiction is not a reason for a downward departure, it is permissible to support a reason for a sentence outside of the advisory guidelines system based on the defendant's unique history and characteristics. In this case, a prohibited ground for departure may be a valid basis for a variance.[31] The defendant committed the instant offense while suffering from a chronic psychological condition of severe gambling disorder that began in late adolescence and remained unabated through adulthood. This condition, which significantly impaired the defendant's ability to control behavior that he knew was wrongful, evaded detection by his parents, as well as professional intervention, creating an inescapable nexus to the commission of the instant offense.

According to the DSM-5, "persistent and recurrent maladaptive gambling behavior" is a clinical mental disorder, and the defendant has a debilitating mental and emotional condition.

---

[31] See e.g., *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (departure precedents do not bind district courts with respect to variance decisions but may be considered "persuasive authority").

Therefore, a sentence under the advisory guidelines system may constitute a sentence that is greater than necessary according to the statutory purposes of sentencing. Accordingly, a variance from the advisory guidelines system may be warranted.

L.      Alternatives to Imprisonment Are Authorized by Statute

Since Mr. Patel's offenses are Class C felonies, he is statutorily eligible for a term of probation should the Court grant a departure, based on a combination of factors, or a variance (or both) from the advisory guideline system.[32] Accordingly, there are alternatives available for the Court to impose a sentence of probation, or to fashion a sentence using the schedule of substitute punishments at USSG §5C1.1(e)(2) and (3). Those sections provide for the use of community confinement (i.e., a Residential Reentry Center – "RRC") and/or a sentence with home detention as an intermediate sanction and are not precluded by statute. Additionally, direct court commitments to an RRC are permitted under the law and BOP policy.[33] Mr. Patel's extraordinary history and characteristics, and his status as a non-violent offender, merit strong consideration.

According to 28 U.S.C. §994(g), there is a statutory bias toward considering the impact of prison overcrowding on the application of the sentencing guidelines.[34] As of February 22, 2024, the total number of prisoners in the BOP is 155,513.[35] "Federal prisons are chronically short-staffed, creating dangerous conditions for both the people working there and for those who are incarcerated. The aging buildings need major repairs and maintenance. The BOP estimates its

---

[32] *See, e.g.*, *United States v. Grams*, 566 F.3d 683, 686–87 (6th Cir. 2009) (*per curiam*) (In contrast to a departure, "a 'variance' refers to the selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of §3553(a).").

[33] Appendix I, Exhibit I.

[34] "[…] [T]he sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission."

[35] https://www.bop.gov/about/statistics/population_statistics.jsp#pop_report_cont.

already overcrowded prison population will expand to 10 percent over capacity in 2024."[36] The BOP continues to experience crowding even in medium and low facilities.[37] Recent trends regarding an evidence-based philosophy toward sentencing encourage the use of sentencing alternatives, including the use of probation.[38,39]

Should the Court find that either a downward departure, a variance, or both, from the advisory guidelines system is warranted, as an alternative to probation, a sentence including the use of substitutes for imprisonment may also be appropriate. Those options may also include an appropriate period of time on supervised release, to include the use of intermediate sanctions, such as intermittent confinement, community confinement, or home detention, as provided in subsection (c)(3) of §5C1.1.[40,41] Furthermore, if required by the Court, most United States Probation Offices will deploy the concept of "intensive" supervision for certain offenders to provide an additional level of risk control, thereby making the service of such sentences incrementally more punitive.   By incorporating these substitutes into the calculus of the sentencing, the statutory factor of punishment – to the extent required – can still be accomplished

---

[36] https://www.themarshallproject.org, Federal prisons are chronically short-staffed, creating dangerous conditions for both the people working there and for those who are incarcerated. The aging buildings need major repairs and maintenance. The BOP estimates its already overcrowded prison population will expand to 10% over capacity in 2024. Federal Prisons Are Over Capacity — Yet Efforts to Ease Overcrowding Are Ending. (January 6, 2024).

[37] Source: Federal Bureau of Prisons Fact Sheet (2024).

[38] "The Task Force recommends that the USSC, as it revises its Guidelines for drug offenses, encourage probation for lower-level drug trafficking offenses." Final Recommendations of the Charles Colson Task Force on Federal Corrections.   From the World Wide Web, Colson-Task-Force-Final-Recommendations-January-2016.

[39] The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant. USSG Ch.5, Pt. B, intro. comment.

[40] One day of home detention for one day of imprisonment. This rule also pertains to the use of jail time as intermittent confinement, as well as community confinement, i.e., the residential reentry center (RRC). USSC §5C1.1(e)(1)-(3).

[41] The BOP has a contract Residential Reentry Center in Jacksonville, Florida. Bridges Federal Reentry Centers, Inc., is an RRC capable of administering a direct court commitment for community confinement.

on multiple levels, without the imposition of a strict sentence of imprisonment.

By successfully completing almost three months of pretrial supervision without incident, along with significant post-offense rehabilitative efforts, Mr. Patel has proven that he is respectful of the law. Consequently, he is amenable to the direction of the Court, as well as being supervised by the United States Probation Office. It is anticipated that Mr. Patel's status as a nonviolent offender suggests that these viable alternatives to a term of conventional imprisonment are warranted in this case.[42]

M.    Examples of Sentences the Court Can Impose

In response to the imperatives under 18 U.S.C. §3553(a), the Court is <u>not</u> statutorily obliged to impose a sentence of imprisonment in this case. This means that there is no minimum mandatory term of imprisonment that must be imposed. Likewise, there is <u>no</u> statutory impediment to the imposition of a term of probation in this case. Subject to a complete §3553 analysis by the Court, there are only two mandated requirements in the statute: That the Court <u>shall</u> impose a sentence sufficient, but not greater than necessary, and that the Court <u>shall</u> consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence imposed.

Therefore, consistent with these principles, listed in order of ascending level of restriction, there are several sentencing configurations that the Court is at liberty to impose in this case:

1.   The Court may sentence Mr. Patel to a term of probation of five years, with pertinent special conditions to include mental health treatment, with an option for inpatient or outpatient treatment for gambling disorder, in addition to an order of restitution.[43]

---

[42] For example, the Court may satisfy the perceived need for imprisonment by imposing a sentence that substitutes placement in an RRC, or an extended period on home detention, as a condition of supervised release, for a straight BOP placement.

[43] Appendix I, Exhibit M. For FY2022, a total of 17.8 percent of offenders sentenced for offenses involving fraud/theft/embezzlement received a term of probation only.

2. The Court may sentence Mr. Patel to a term of probation of five years, with special conditions for a period of home detention (to include the use of electronic monitoring), and mental health treatment, with an option for inpatient or outpatient treatment for gambling disorder, in addition to an order of restitution.[44]

3. The Court may sentence Mr. Patel to a term of probation of five years, with special conditions for a period of community confinement in a residential reentry center (RRC), and mental health treatment, with an option for inpatient or outpatient treatment for gambling disorder, in addition to an order of restitution.[45]

4. The Court may sentence Mr. Patel to a sentence of one day time-served to be followed by a three-year term of supervised release, with special conditions for a period of community confinement in a residential reentry center, and mental health treatment, with an option for inpatient or outpatient treatment for gambling disorder, in addition to an order of restitution.[46]

5. The Court may sentence Mr. Patel to a term of imprisonment of 12 months, with a recommendation to the BOP for placement by direct court commitment to a residential reentry center for six months, to be followed by a three-year term of supervised release, with special conditions for six community confinement in residential reentry center, and inpatient or outpatient treatment for gambling disorder, in addition to an order of restitution.

These sentencing combinations are available to the Court should the Court exercise its discretion to depart downward from the advisory guideline range and/or impose a variance from the advisory guideline system. Accordingly, the Court is implored to consider this information in its §3553 analysis for the imposition of a sentence that is not greater than necessary based on all of the available evidence at sentencing.

---

[44] USSG §5F1.1. <u>Community Confinement</u>. Community confinement may be imposed as a condition of probation or supervised release. "Community confinement" means residence in a community treatment center, halfway house, restitution center, mental health facility, alcohol or drug rehabilitation center, or other community facility; and participation in gainful employment, employment search efforts, community service, vocational training, treatment, educational programs, or similar facility-approved programs during non-residential hours. §5F1.1, comment. (n.1).

[45] *Id*. Exhibit M. For FY2022, a total of 5.5 percent of offenders sentenced for offenses involving fraud/theft/embezzlement received a term of probation and alternatives to imprisonment.

[46] One day of community confinement (residence in a community treatment center, halfway house, or similar residential facility) [substitutes] for one day of imprisonment; one day of home detention for one day of imprisonment. USSG §5C1.1(e)(2)-(3). <u>Schedule of Substitute Punishments</u>.

N.       Recently Sentenced Wire (Financial) Fraud Cases

To aid the Court in considering the national sentencing landscape in its §3553 analysis,

these examples illustrate recent sentences imposed on similarly situated defendants:

- United States v. Zeb O. Sartin, Eastern District of Louisiana, Case No. 22-194 "H", Convicted of Conspiracy to Commit Wire Fraud, Conspiracy to Commit Money Laundering; Sentenced on January 3, 2024, to **probation for 36 months**. A special condition requires that the defendant shall be **placed on home detention, with location monitoring technology as directed by United States Probation, for a period of twelve (12) months**, to commence immediately.   Ordered to pay $2,100,690.76 in restitution[47]

- United States v. Dillon J. Arceneaux, Eastern District of Louisiana, Case No. 22-194 "H", Convicted of Conspiracy to Commit Wire Fraud, Conspiracy to Commit Money Laundering; Sentenced on January 3, 2024, to **probation for 36 months**. A special condition requires that the defendant shall be **placed on home detention, with location monitoring technology as directed by United States Probation, for a period of twelve (12) months**, to commence immediately. Ordered to pay $1,604,581.42 in restitution[48]

- United States v. Lance M. Vallo, Eastern District of Louisiana, Case No. 22-194 "H", Convicted of Conspiracy to Commit Wire Fraud, Conspiracy to Commit Money Laundering; Sentenced on November 13, 2023, to **probation for 36 months**.   A special condition requires that the defendant shall be **placed on home detention, with location monitoring technology as directed by United States Probation, for a period of twelve (12) months**, to commence immediately, or within ten (10) days from the date of sentencing. Ordered to pay $876,035.05 in restitution[49]

As illustrated by the above sentences, the so-called seriousness of the offenses – vis-à-vis

variable loss amounts, and the need for just punishment – are not precisely, uniformly, or inevitably

proportional to the amount of proceeds emanating from the underlying offense. These cases serve

as representative samples of several cases where defendants have received alternative sentences –

including probation – which are more in line with the individual circumstances of the offense, as

well as the history and characteristics of the offenders.

---

[47] Appendix I, Exhibit N.
[48] Appendix I, Exhibit O.
[49] Appendix I, Exhibit P.

The guideline at §2B1.1 has been roundly criticized in legal and academic circles as "not anchored in empirical data" and "the loss table is insensitive to motive" – the reason <u>why</u> the offender committed the offense – thereby making it a "highly imperfect proxy" for both the seriousness of the offense and the relative culpability of the offender.[50]  In stark contrast to possible outcomes for alternatives to imprisonment, the advisory guidelines imprisonment range calculated by the probation office is 78 to 97 months and would result in a draconian sentence. Respectfully, Mr. Patel's history and characteristics suggest a different result. Accordingly, under an analysis of §3553 factors, this information may be relevant to the calculus of determining the possibility of the imposition of a sentence that is greater than necessary.

O.    <u>Certainty vs. Severity of Punishment</u>

Mr. Patel has pleaded guilty to an offense punishable by a term of up to 20 years imprisonment. While the plea agreement offers a benefit to Mr. Patel, he is faced with the certain possibility of a low-end sentence of 78 months imprisonment, should the Court impose a sentence under the advisory guideline system.[51]  Mr. Patel will be 31 years of age at the time of sentencing and faces the risk of an inopportune absence from his family, at an age substantially younger than the typical offender convicted of fraud/theft/embezzlement offenses.[52]  Additionally, Mr. Patel has all but forfeited a career in the accounting/financial services industry based on regulatory restrictions. Mr. Patel recognizes that whatever sentence the Court imposes, it will require his most fervent attention and compliance with the Court's order.

---

[50] Barry Boss and Kara Kapp, <u>How the Economic Loss Guideline Lost its Way, and How to Save It</u>, Ohio State Journal of Criminal Law, Vol: 18.2:605.

[51] Should the court sustain defendant's objection to a 2-level increase for "sophisticated means" the low end of the advisory sentencing range would be 63 months.

[52] For FY2022, the mean and median ages of offenders for this type of crime were 43 and 41, respectively. SOURCE: U.S. Sentencing Commission, 2022 Datafile, USSCFY22.

Given Mr. Patel's current reflections of remorse, exceptional acceptance of responsibility, and other strong factors in mitigation articulated throughout the body of this report, a sentence under the advisory guideline system would produce no additional statutory benefit to society, given Mr. Patel's unique history and characteristics. Criminological research to date indicates that increases in the <u>certainty</u> of punishment, as opposed to the <u>severity</u> of punishment, are more likely to produce deterrent benefits.[53] Mr. Patel fully apprehends and is impressed by the reality of a prison term. It is anticipated, however, that a sentence that utilizes probation, or substitutes community confinement, or home detention, according to the schedule of substitute punishments at USSG §5C1.1(e), would produce a sentence that is sufficient for all the statutory purposes of sentencing. Such a sentence, with relevant special conditions and an order of restitution, appears to be apropos in this case.

WHEREFORE, it is respectfully requested that this Honorable Court consider the personal characteristics of Mr. Patel in fashioning a sentence that is sufficient, but not greater than necessary in comportment with §3553.

---

[53] Wright, Valerie Ph.D., <u>Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment</u>, The Sentencing Project. November 2010.

Respectfully submitted,

**First Coast Criminal Defense**

    /s/ Alex King
Alex King, Esq.
Florida Bar No.: 0086034
1805 Copeland Street
Jacksonville, Florida 32204
Tel: (904) 355-7777
E-mail: Admin@JaxCriminal.com
Attorney for Defendant

Attachments

Appendix I Exhibits A-P
Appendix II Exhibits (*Letters of Support*) 1-21

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by email to:   Michael Coolican and Brenna Falzetta, Office of the United States Attorney, Michael.Coolican@usdoj.gov Brenna.Falzetta@usdoj.gov, this 7th day of March, 2024.

    /s/ Alex King
ATTORNEY